Thank you. Good morning to all of you. Are you able to hear me? Yes. Can you hear us? Is it Mr. Gallipo? Yes, it is. And I can hear you all very well. Great. So I am appearing on behalf of the appellants and the plaintiffs in the underlying case. The short version of our argument is that the court— Counsel, if you have any way to turn up your volume a little bit, if not, we can handle it. I can try to get someone to help me, but I'll pull it closer and speak louder. Is that any better? Yes. Thank you, counsel. You're very welcome, Your Honor. In short, the appellants believe that the court erred in granting summary judgment on the first volley of shots for two reasons, and that affected the trial in terms of the second volley of shots and also in terms of the negligence claim. The reasons we believe the court erred in the first volley is we believe whether the mistake that Mr. Childress was armed was reasonable or not was a question of fact for the jury. And also, whether he posed an immediate threat of death or serious bodily injury at the time of the first volley was also a fact for the jury to decide. The effect of that on the trial was that the jury implicitly was led to believe that the first volley was appropriate, because we couldn't argue it, we couldn't put expert evidence on regarding it, and they were only asked to opine on the second volley. And in both the first volley and the second volley, the officers didn't specifically see a gun, and so there was only two seconds between the two volleys. And the reason we think the court erred is because, as Your Honors are aware from reviewing the record in this case, the two shooting officers never specifically identified a gun. Sergeant Bohannon thought it was possibly a cell phone based on its size, shape, and color, and never saw any of the identifying features of a gun when he saw the object in the hand as Mr. Childress crossed the street. Nonetheless, he announced to Officer Wolford, who had only been on patrol for a few months, that he has a 413, which is their code for a gun, and Officer Wolford... Do you mind if I ask you this question? To set the stage, as I understand it, the deputies are told that he may be wanted for an attempted homicide. They are given information that he may have been in possession of a gun or may have had access to a gun. They arrive there. They see this black object in his right hand. They warn him over 20 times to drop your weapon, show your hands. He's ignoring those commands. He approaches them at a pretty rapid pace, and then they shoot. And the district court found that that was reasonable as a matter of law, and I'm struggling to see what is the tribal issue in a mistake that that might have been a gun in his possession. Yes, Your Honor. If I may respond to that. So your recitation of the facts is accurate with a few qualifications. They had no specific information he had a gun. But they were told, as my colleague said, that he was wanted. What was it? Attempted murder? Attempted homicide. That is true. That is true, Judge Bennett. But they didn't know what the facts of the case were, what weapons, if any, were involved in the case, and they admitted they had no specific information he had a firearm. There was, as you may recall, a firearm found in a vehicle associated with him that was registered to his uncle. So what I think is important, Judge Sanchez, is when they first saw him crossing the street, the object they saw in his hand, and this was just the sergeant, in the sergeant's mind was consistent with a cell phone, and he could not identify it as a gun. A gun was found, as you just stated, in his uncle's car, and when he exited his house, if I'm recalling the facts right, he started to approach the car. So there's some connection there, isn't there? Well, yes, there is in that way, Judge Thomas. But I think that in some ways, arguably, taking all the facts in the appellant's favor for the MSJ analysis, that might cut against him having a gun if a gun was found in his car and he separated himself from the car. But what I was trying to focus on is when they actually saw him, they never ID'd the item as a gun and they thought it was possibly a cell phone, which, of course, it was. So, counsel, my understanding is at the time, according to the district court, at the time of the shooting, he was about 45 feet away. He had ignored what the district court described as 25 verbal commands. If we were hypothetically to accept your view that there was a triable issue of fact at 45 feet, is there a distance where there wouldn't be a triable issue of fact? No, I don't think so, Judge Bennett, for two reasons. So 25 commands to stop. He'd been told he was wanted for attempted homicide, that even if he got to 10 feet, that they still wouldn't be allowed to shoot. Correct. Well, it depends on the fact finder's interpretation of the facts. So there'd have to be two prongs. One, the belief that he had a gun would have to be reasonable. That would be the first prong. But that would not be enough because obviously there's a lot of Ninth Circuit precedent that says a gun in someone's possession, even in their hand, is not enough to shoot them. We have George v. Morris and many other cases that say that. So first, they'd have to have a reasonable belief he had a gun. And then secondly, it'd have to be an immediate threat of death or serious bodily injury. And that, we believe, is also a triable issue of fact in the case. So at least from the appellant's perspective, under the facts of the case, and there was no verbal threat, obviously, he was approaching them. You can see that in the video. One of the officers, in response to your question, Judge Bennett, basically said, I thought in my mind, if he gets to the middle of the driveway, I'm going to shoot him. He never saw the object. That was Officer Wolfer. And he got to the middle of the driveway and started shooting him. And so, at least from the appellant's perspective, we realize there is evidence in the case to support different theories. But we did not think it was appropriate as a matter of law to say the shooting was reasonable in the first volley when the officers never saw a gun. And his hand, according to the officers, never came out with an object or up and towards them. And he had never verbally threatened them. And they had cover behind the car and less lethal options available of a taser. But the other problem that we encountered… Can I ask you, suppose Mr. Childs did have a gun. Is it your view that it would still be a tribal dispute if he did not raise the gun toward the officers and he was shot? Or would that change the circumstances? I don't think it would change necessarily. It's certainly better for the appellants that he didn't have a gun and it was a phone. And I think in part, Judge Sanchez, the fact that the one officer thought that it might be a phone we felt was very important in this case because of the shape, size, and color of what he saw. But given that there was no furtive movement with the object coming out, the hand raising, and no verbal threat… I still think it's a tribal issue of fact as to whether shooting him at that point was excessive or not under the Fourth Amendment. Counsel, maybe you might want to turn to your second issue. Yeah, thank you, Judge Bennett. So, this really affected the negligence issue. Because based on the court's ruling, he would not allow any argument or evidence that there was any negligent conduct before the first volley of shots. Because he had found the judge that everything was reasonable up until the first volley. So, the only negligence that we could argue, which we thought was inappropriate, was in between the first volley of shots and the deployment of the canine. So, the fact that the one officer said that he had a gun and he never saw one, the fact that they didn't designate someone less lethal, none of that we could argue. And the judge also held that you can have a negligent shooting, which we think is inappropriate and contrary to Nevada law. We cited the Supreme Court case of the estate of Brenes, saying that you can have a negligent shooting for an intentional act of using deadly force. But it really hurt us when we got to the apportionment. Because under Nevada law... So, counsel, why don't you assume hypothetically that I might agree with you as to the second volley. So, on the negligence claim. So, if I were to hypothetically agree with you that there's more there on the negligence claim for the second volley, would there be any reason why we shouldn't certify to the Nevada Supreme Court this issue which seems to have divided judges on the district court as to whether an intentional act of shooting can be factored in by the trier of fact in determining a negligence claim that arises from a shooting? Judge Bennett, I don't think there's any reason not to. However, I would indicate, as I previously stated, on another case I was involved in, the Nevada Supreme Court did take up the issue in the Brenes case and specifically held that you can have a negligent shooting, even with the intentional use of deadly force. But perhaps, to the extent it's unclear, I have no opposition if your honors thought that would be appropriate. But the point that I was trying to make, if I could, because I know I'm running out of time, I'm sure. Under Nevada law, if there is 50% or more contributory or comparative negligence on the decedent, you cannot recover. And that's what happened in this case on the negligence claim. They found the two officers collectively, I believe, 25% negligent and the decedent 75%. And therefore, we could not recover any monetary recovery. Under the decedent's negligence, the jury was allowed to consider all his negligence at all times. Prior to the first volley, during, after, etc. But we were limited to only considering the negligence of the officers between the first volley and the deployment of the canine, just a few seconds. So we believe that also prejudiced us in getting such a high percentage on the decedent, considering all his negligence, and a very limited percentage on the officers. And therefore, we weren't able to recover anything because of the Nevada law on contributory negligence. So we believe not being able to argue the negligent tactics and argument, negligent tactics before the first volley of shots as it related to the second volley, was also prejudicial and unfair to the plaintiffs. Counsel, I should know the answer to the question I'm about to ask, and I apologize that I don't remember. But was there any evidence offered at trial as to whether the first volley of shots was fatal alone without regard to the second volley? That's a great question, Judge Bennett. In fact, I was thinking about that as I was preparing for the argument today. There was no specific evidence on that that I can recall, which was also problematic, we believe, in presenting the case, because I couldn't talk about the first volley being excessive. And then the jury may have been unable to decide which volley were the fatal shots. And we believe that further prejudiced our presentation of the case at trial. We simply believe, and we are aware there's negative evidence in this case. As you all are aware, many of these cases have a lot of negative facts, and they're very challenging for the plaintiffs. But we just simply feel the jury should have been able to decide both volleys of shots. And taking the one volley away from us affected, we believe, the finding on the second volley, and further affected how the negligence claim was handled. In fact, I believe – I know that there seems to be an open question in Nevada about whether an intentional act can be negligent. And in the Assata-Brennan case, which I read, is an unpublished decision. Let me ask you this. Does Nevada law opine on whether a negligence claim is coextensive with a Fourth Amendment claim, or whether negligence can provide for a broader scope of liability than Fourth Amendment reasonableness? Judge Sanchez, I don't believe the – at least from the California Supreme Court. I know my colleague, Mr. Anderson, is familiar with Nevada cases. But I don't believe they specifically address the issue. As you know, in California, we have the negligent use of deadly force. And some courts have, I think, mistakenly in Nevada, felt that you can't have a negligent shooting. And there's even arguments of whether discretionary immunity would apply, which I think Brenna said would not. So, I do agree that this case is right for consideration. And maybe we can get a published opinion going forward to clear up some of these issues for future cases where negligence is claimed. Now, unfortunately, as you probably also know, under Nevada law, there's a cap on what you can get under state claims, like for negligence. And I can't remember exactly, but it might be something like $150,000, even in a wrongful death case. So, although it's still limiting, it at least gives people a chance to present that theory of the case if the facts and law support it. All right. Thank you, counsel. We've taken up a lot of your time with questions, and we'll give you a few minutes for rebuttal. Thank you, Judge Bennett. Good morning, Your Honors. Craig Anderson on behalf of Officers Bohannon and Walford. A lot was talked about right there. I'll start with the first folly of shots. The judge got it right on the summary judgment order. When we look at these cases, as you're all very well aware. Counsel, could you move the mic a little closer, please? Stand further back, because I'm usually too loud, so I'll speak louder, too. This case is a rather easy one on the first folly of shots, because the facts are unique in that you actually have a fleeing felon, who is suspected of a violent crime, who is actively attempting to evade arrest. So, the first two grand factors easily weigh in favor of the officers. Even plaintiff's experts agreed with that. So, we come to the second prong, which is always the important one, which is whether he presented an immediate threat. The plaintiff's argument has always been that they had to identify a gun before they could have perceived an immediate threat. But the actual identification of a gun is not necessary. And plaintiff's favored case in this matter is the George case, which says that. It says that what you're looking for is whether there's a threatening gesture or a harrowing act, and you do not have to see the gun before you shoot. Here, what's very interesting is that the officers gave him 25 commands, as you said, over two and a half minutes. And when you're dealing with an officer-involved shooting incident, two and a half minutes is a very long time. Most of the cases that the plaintiff relies upon, SRD had, George, Cologne, involve very quick decisions, less than five seconds from the time the officer confronts the suspect. Here, the officers did exactly what this circuit has instructed them to do. They attempted to quarantine the plaintiff. They were just attempting to arrest him. He was a known fleeing felon out of Arizona for a violent crime. They requested low-lethal shotguns. They requested canines. They had a helicopter. And then most important is they were giving warnings. So the criticism that the officers identified this black object as a gun was based upon the plaintiff's treatment of the object. Both officers testified that he was keeping his hand close, that Childress was keeping his hand closely guarded to the right side of his body, presented away from the officers, indexing the cell phone as if it was a gun. And then when Officer Bohannon, on multiple times, says, drop the gun, he never tells them it's not a gun. He makes no effort to instruct them that, hey, you've got this wrong. This is a cell phone. So it was his intention to lead the officers to believe, or a reasonable officer would believe, that he wanted them to think this was a gun. And then most important is when Officer Bohannon complied with this circuit's law and gave a warning and said, if you advance on us, we're going to shoot you, he advanced. So the suspect in this case, Mr. Childress, was the person provoking the officers' actions. In the cases of— Could I ask, Mr. Anderson, if he's 45 feet away, can the other less lethal alternatives even be deployed? As I understand it, I think a stun gun won't reach that far, or maybe a shotgun, a beanbag shotgun won't either. Are those viable options at a distance of 45 feet relative to someone raising a gun and trying to shoot at the officers? Okay, so if available, a taser at this point in time, 2015, was 15 to 20 feet. That was the range that they would be valid at. Low lethal shotgun could have been, but they didn't have one. They would have been requested and they were waiting for it. If you wanted to use low lethal in this situation, the only, I think, viable option would have been a canine, which was also in route and not present at the time that he advanced. So they were attempting to get these low lethals there, or these less than lethal options available to contain him, but only, I think, the canine and potentially a low lethal beanbag would have been viable in this case. Was there an opportunity— Is there evidence that there might have been an opportunity to retreat and reestablish a perimeter or do something else to allow those alternatives to come to the scene? There's always that option. Now, there is no duty to retreat. That's very well established in Ninth Circuit law. Now, the problem you have in this case is that he's in a residential area, so he has access to these homes. He has access, and they don't know whose home. They don't know if citizens are present. So to retreat and allow him to do what he wants to do would probably not be the best decision in this case. He's not in an open field. He's not in a parking lot. He is actually standing in the driveways and the porches of residential homes. So I think it would have been negligent of the officers to have protected their own safety by leaving and leaving those citizens unprotected. But there would have been no duty to do so either under this circuit's law. So I think that what's most important here is that he ignored the warnings and that he provoked them. Clearly, he knew they thought he had a gun. He wanted them to think that, and he advanced on them when they specifically instructed him not to. Well, whether he wanted them to think it or not, he did nothing to disabuse them. Did nothing to disabuse them. So what would a reasonable officer think? And so once you're telling someone, hey, we think you have a gun and we're pointing guns at you, a reasonable officer or an objectively reasonable officer would assume that person would either comply or take some steps to protect himself, not by walking out. And he kept his hand to his right side in the pocket when he was walking at them. Can we turn to the negligence claim? Because the court's decision to exclude intentional acts from a possible negligence theory seems to me to might have affected how evidence was presented at trial and certainly how the jury was allowed to consider certain things. To Judge Bennett's question to opposing counsel, why shouldn't we certify that question to the Nevada Supreme Court? Okay, great question, and this is not the case to certify, and I'll explain why. We use the word negligence. It's a broad term. So the question that I would ask rhetorically back to you is what was the negligence? We went through that with their expert witnesses. What their experts came up with is these officers, their words, did a very good job up until the time they fired the first round. Expert Roger Clark was the only criticism in the negligence field was that they identified the object of the gun as a gun, which the district court found to be a reasonable decision by the officers. So there is no evidence of negligence prior to the first shooting. The officers had every lawful right to be on that property. They had every lawful right to be attempting to take him into custody. They had every lawful right to be on gun. But what about the decision to shoot the second time? Okay, so that would be a battery because it's an intentional act where they're shooting, where their testimony at the trial was we still perceived him to be an immediate threat. He went to the ground. They perceived him to still be attempting to get up. His hands were still not visible. So the negligence would be, which they argued at the trial, the negligence was during the second volley, they still failed to identify the dark object as a gun. They had still not identified a gun. But he's lying on the ground. Correct. After he'd been shot a number of times. Correct. And the jury was not allowed to consider whether the second volley was negligent, right? They were allowed to consider whether the officer's tactics after the first volley until the K-9 was taken off of Mr. Childress, if there was any negligence. But as I understand it from looking at the jury instruction, which is not the clearest instruction in the world at ER-4, but the court's ruling, which was fairly clear, was they couldn't argue that firing the gun in the second volley was the negligent act, right? Correct. Okay, so why wasn't, if intentional acts under Nevada law could be part of a negligence claim, why didn't the trial court err in preventing the plaintiff from arguing that firing the second volley at a man who's just been shot and is lying on the ground is negligent? The shooting itself. Okay, because under Nevada law, and I refer you to the Rocky Mountain Produce case, a negligent act cannot be an intentional act. An intentional act cannot lead to negligence. Negligence is an unintentional act. But I don't see the Nevada, I mean you can certainly push back on this, but I don't see Nevada law in a published opinion of an appellate court absolutely establishing that in, for example, a shooting case, firing an intentional shot at someone can't be also a negligent act. And you would be correct in that, because we do not have a published Nevada Supreme Court case on an officer. So then why isn't that relevant, that if the jury could have here considered whether shooting him the second time was negligent, if that evidence could have been considered by the jury in deciding whether there was a failure of due care in shooting the second time, why shouldn't we certify the question? Well, now if I'm, now I don't have the jury instruction in front of me, but if I recall correctly, what they were instructed was they were allowed to consider the officer's actions after they ceased firing the first volley and until Childress was taken off. I don't believe it ever said you cannot consider the firing the intentional act. Well, I'm looking, for example, at ER 430, where the court is describing her ruling, right? Describing what? The judge was a woman, right? No, this was judge... Okay, sorry. Okay, I apologize. But anyway, his ruling. So the judge says, so the negligence claim will be cabined between the time after the first volley of shots until the time that the police canine officer was taken off Mr. Childress. So that will be the period of time that the negligence can address. And wasn't he shot the second time after the dog was off? No, he was... The dog was still on when he was shot the second time? No, so the volley of shots is all within eight seconds. It's boom, boom, boom, boom, boom. He then is off to the side for about 30 seconds before the canine is placed on him. Okay, so there are no shots at all after the dog is off? No, the canine's 30 seconds after the last round is fired. Okay. And so I don't believe the instruction limited the jury to not considering the second shots. But I thought there was a pre-trial decision by the court to say that intentional acts cannot be part of negligence. Correct, that was my... So that would have foreclosed counsel arguing that the second volley of shots itself could be a negligent act. So... That's my understanding. Yeah, that would be correct. I'm just saying it wasn't in the jury instruction. Okay, so yes, I agree I got it wrong. But counsel was told by, and this was Judge Boulware's ruling that the second district judge adopted, you can't argue to the jury shooting him the second time was itself negligent. So my argument to that would be they argued battery, and that's what they argued extensively. That's the claim they wanted to win on because it wasn't cat. And a battery is an unreasonable shooting. The jury found in favor of the officers... But the jury instruction for battery would not be the same as for negligence, right? It was not the same. It was the same as the Fourth Amendment claim. It's the same as the Ninth Circuit's Fourth Amendment claim. But in addition, if they could have argued exactly that shooting the second time was negligent, that also could have changed the percentages, right? So what they argued was close to that. What they argued was that they failed to identify a gun still and fired the second volley, okay? And so that was their negligence theme was they still hadn't identified a gun and then two seconds later they fired a second volley. And so I get these are morphing together because I have a hard time understanding how the negligence claim would come out differently where they found the shooting was reasonable, but they found the officers essentially were 25% at fault for not identifying it as a gun, but that he still presented an immediate threat and they still acted reasonably in firing at him. Which gets to my question that I posed to Mr. Gallipo, which is if Nevada law has negligence theories be coextensive with the Fourth Amendment, then that would seem to preclude any separate negligence recovery. But if it's not, for example, in California, the negligence theory can be seen as broader and different than the Fourth Amendment reasonable in this inquiry, in which case a jury might decide that even if an officer acted reasonably under the Fourth Amendment in the second volley, they still could have acted negligently. So correct. And so I'm only aware of California, and I obviously didn't do the thorough research on this. I'm only aware of California allowing an intentional act in a police shooting to be a negligent act as well. Other jurisdictions make you pick. With respect to the actual shooting, now jurisdictions what they allow is you can argue negligence in tactics. You can argue that, you know, for example, as Your Honors posed to me, if they had backed up, if they had retreated, and a jury could find that to be negligent in a certain situation, that's why this case is unique. Typically, you know, as Your Honors well aware, it just popped into my head, was the Napook case you and I did, where two officers stayed on gun where one probably could have gone to taser or should have gone to taser. And that would be, it's not excessive force because both officers were lawfully on a gun because they were presented with a deadly threat, but it might have been negligent for one of them not to. So here, what was unique is both of their experts said the officer's tactics were exemplary. They did everything right until they fired. They had everything they did up until that point. So that's why I don't view this as the best case to certify the Nevada Supreme Court on a negligence tactics claim because there is no evidence of negligent tactics. Well, let me ask you this because the state of Brennan's, the unpublished Supreme Court decision, seems to strongly suggest that there can be, and that's a police shooting case, and Rocky Mountain is not, it's a very different circumstance. But Brennan seems to suggest that intentional shooting by a police officer could lead to negligence liability because it sent it back and said, go and take another look. And the court rejected an argument about discretionary immunity. It would not apply in that circumstance. Which I think is specific to a negligence theory, if I'm not mistaken. And I wish I could remember the exacts because Brennan's was my case with Mr. Galipo's office. And if I recall correctly, is that that order that you're referring to was on the summary judgment order. And so when we went, and I would agree with that in this case too, that you go through the evidence at trial and then you look at whether there's evidence of negligence and or excessive force. And if I recall, and I could be wrong on this in Brennan's, the negligence claim came out and it went to excessive force. Now with discretionary immunity, the discretionary immunity was denied in Brennan's for the shooting because you cannot violate the constitution and get discretionary immunity. But discretionary immunity applies in Nevada for tactical decisions. And so again, the actual shooting would not be protected by, in this case either, by discretionary immunity, but the tactics. So for example, another good example, go back to the example we're using, to retreat. You could have retreated, you could have been negligent not to retreat, but that's a discretionary decision that the officers are making that would be protected under Nevada law. If that makes sense. It may or may not, but I guess to Judge Bennett's point, if the second volley is itself open to a negligence theory, then as you're arguing, that too would not be subject to discretionary immunity. Well, because... There's a lot of uncertainty around this case that could be affected by what the Nevada Supreme Court decides on these questions of law. And I understand what your honors are saying. It's just in this case, there was so little evidence of negligence. Except, and I'm sorry to interrupt your answer to my colleague, but I take your point on that, except there was something here, even with the limits that the court placed on it, that the jury found that the officers did that was negligent. We of course don't know what specific acts they relied on, but notwithstanding your view and your argument that there was no negligence here, the jury found that there was. So the negligence argument was the failure to identify the dark object as a gun. But there's no special verdict, right? There's no special verdict. Correct, your honor. All right. Thank you, counsel. Thank you, your honors. Counsel, we'll give you two minutes for rebuttal. Thank you, Judge Bennett. So just briefly, I do think it's clear from this discussion that this case should be certified to the Nevada Supreme Court. There seems to be uncertainty or unclarity and the Brennis decision, as Judge Sanchez pointed out, is unpublished. Number one, can you have negligence in an intentional shooting and what's considered? Obviously under California law, the pre-shooting tactics is a factor to be considered as to whether the shooting was negligent. Secondly, I think it needs to be made clear that discretionary immunity does not apply to a use of deadly force case. Thirdly, I'd like to say that there was evidence of pre-shooting negligence, including I think one of the questions perhaps Judge Sanchez asked about and discussion about whether they should have waited to get the canine and less lethal resources there and perhaps tactically repositioned. Now the problem that I had, given the court's rulings, I was told if I, and I think this is in our brief, if I discuss any pre-first volley shooting tactics or negligence, then the court's going to instruct the jury that the first volley of shots was found justified as a matter of law. So I was very limited as to how I can present my case, including on negligence because of that ruling and because of what Judge Bennett has been saying about the limited timeframe of the consideration. And not only do I think it would be good to clarify these points going forward by way of the Nevada Supreme Court, I do agree that it would have changed potentially the percentages, which then would have allowed the plaintiffs to have some recovery, albeit limited, because the jury was told you can consider such a small slice in considering negligent. And I was specifically told I couldn't argue that the shooting itself was negligent. So I really felt the plaintiffs were unduly prejudiced by the court's rulings. And I am very supportive of the Nevada Supreme Court taking a look at this issue, and I thank you for listening, unless anyone has any other questions of me. No, we thank both counsel for their arguments. The case just argued is submitted. With that, we'll move to the final case on the argument calendar.
judges: BENNETT, SANCHEZ, THOMAS